UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TRACY COPP,

    Plaintiff,

    v.                            CIVIL ACTION NO. 23-12095-MPK[1]

NIC & ZOE COMPANY,

    Defendant.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (##55, 59.)

KELLEY, U.S.M.J.

I. Introduction.

After she resigned because of the "'unsafe, demoralizing, and bullying environment'" she says she was subjected to, the Plaintiff, Tracy Copp, brought this action against the Defendant,[2] Nic & Zoe Company ("Nic & Zoe"), her former employer, asserting claims under Massachusetts law (Counts I and II), federal law (Counts III and IV), and the common law (Counts V-X),[3] and seeking damages, costs, and fees. *See* #1-1 ¶¶ 25, 56-119.

Pending before the court are cross-motions for summary judgment: Copp's "Motion for Partial Summary Judgment as to Liability on Counts I and II" (#55); and Nic & Zoe's "Motion for Summary Judgment" (#59) on Counts I-VIII and X.

---

[1] With the parties' consent, this case was re-assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#16.)

[2] Copp brought suit against Nic & Zoe on July 19, 2023, in the Massachusetts Superior Court for Middlesex County. *See* #1-1 at 5-20. Nic & Zoe removed the matter to this Court on September 12, 2023, pursuant to 28 U.S.C. §§ 1331 and 1441. (#1 ¶ 6.)

[3] Count IX, "Unjust Enrichment," was dismissed on July 30, 2024. *See* #27.

For the reasons set out below, Copp's motion (#55) is denied, and Nic & Zoe's motion (#59) is allowed in part and denied in part.

II.  Background.

The following facts are undisputed unless noted otherwise.[4]

A.  Copp Is Hired by Nic & Zoe.

Nic & Zoe is a business that sells clothing and accessories.  (#67 ¶ 3.)  In 2017, Copp was hired to work as an assistant manager at its retail store in Hingham, Massachusetts.  *Id.* ¶ 1.  Copp, an experienced retail manager, was promoted to store manager the next year and in that position, was paid a salary.  *Id.* ¶¶ 5-7.

Copp's primary duty as a store manager was to manage Nic & Zoe's Hingham location. *Id.* ¶ 31.  According to her written job description, her core responsibilities as a store manager were to, among other duties:

> [p]rovide an exceptional in-store experience; [m]eet and exceed daily, monthly, and annual store sales and profit goals while maintaining expenses; [l]ead and manage a team of Brand Stylists . . . ; [a]nalyze and react to business trends . . . ; [p]erform and supervise store opening/closing procedures . . . ; [c]onduct daily store meetings . . . ; [m]aintain payroll budget and weekly hours to ensure appropriate sales floor coverage . . . ; and [p]erform inventory responsibilities[.]

*Id.* ¶ 32.

Consistent with these responsibilities, Copp made hiring and firing decisions in partnership with Nic & Zoe managers; implemented company policies, practices, and procedures for training and coaching employees; and scheduled staffing for the store.  (#64 ¶¶ 37-40, 42, 45-46.)

---

[4] The facts are drawn from: (1) Copp's Statement of Undisputed Material Facts in Support of Her Motion for Partial Summary Judgment" (#57) and (2) Nic & Zoe's responses (#67); (3) Nic & Zoe's Statement of Undisputed Material Facts (#61); and (4) Copp's responses (#64); (5) select exhibits attached to the "Affidavits of Gregory Sager, Esq." (##58, 65); and (6) select exhibits attached to the "Declaration of Maureen S. Berry" (#62).

Anne Song, a Nic & Zoe area manager who served as Copp's direct supervisor throughout Copp's time with the company,[5] *see id.* ¶¶ 10-11, described the most important duty of a Nic & Zoe store manager as "[t]he efficient operations of their store, their four walls." (#58-11 at 6.) Robert McDonald, Nic & Zoe's Vice President of Human Resources, *see* #64 ¶ 37, described it as "the overall business management of successful operation of the store[,]" with sales transactions "incidental" to a store manager's job and not their "primary responsibility." (#58-12 at 3, 11.) Copp herself understood her "most important duty" to be "the daily operations of the store, communications to keep that store running in fit condition, my employees staffing the store," and "sales and merchandising[.]" (#58-7 at 23.)

B. Copp's Eligibility for Overtime Pay.

Nic & Zoe classified its full-time, salaried store managers, such as Copp, as overtime-exempt employees. *See* #62-1 ¶ 5. Copp says that she was misclassified, however, and that she never received overtime pay when she worked more than forty hours a week. *See* #67 ¶ 8. Nic & Zoe disputes these points and claims that Copp was appropriately classified and that staffing schedules for the Hingham store do not show that she worked more than 40 hours in a week. *Id.* ¶¶ 19. Copp, who was never required to clock in or out of work, *see id.* ¶ 21, acknowledges that she never tracked her hours. *See* #58-7 at 11.

C. The COVID-19 Pandemic Affects Store Operations.

In March 2020, Nic & Zoe temporarily closed its retail stores in response to the COVID-19 pandemic. (#67 ¶ 9.) When the Hingham store reopened in June 2020, it did so at reduced staffing levels. *Id.* ¶¶ 10-11; #62-2 at 5. Copp was directed, along with other store managers, to schedule

---

[5] Song was later elevated to Nic & Zoe's Director of Stores. *See* #62-9 at 4.

only sixty "payroll hours" per week and to allot forty of those hours to herself.[6],[7]  (#67 ¶¶ 12-13.)

As Song explained:

[w]hen we reopened after COVID, it was extreme and we were all, every store was given their manager and 20 hours to cover their days off and that was all that was expected. . . . it was the manager plus 20 hours to allow them to have two days off and maybe a day where they had a little overlap with that person to communicate needs of the business or things that might need to be done. Otherwise, they wouldn't see the person that was covering their days off. . . . that was just the quick re-entry into the world.

(#62-9 at 18-19.)

According to Copp, following the store's reopening, her "core responsibilities had changed" and "[t]he focus was just sell."  (#67 ¶ 55.)  Copp says that, during this period, she worked "far more than 40 hours practically every week[,]" *see id.* ¶ 15, and that it was difficult, given the reduced staffing levels, to take any time off.  *See* #62-12 at 74.

D.  Copp Is Injured While Working and Takes Medical Leave.

Copp worked alone at times, which caused her to experience stress.  *See* #67 ¶ 24.  On January 14, 2022, while working alone in the Hingham store, Copp fell off a ladder while retrieving inventory in the back stockroom and injured her ankle.  *Id.* ¶ 26; *see* #64 ¶¶ 90.  Although she had warned employees not to climb the ladder if they felt unsafe, *see* #64 ¶ 69, Copp says she fell because she was rushing.[8]  (#67 ¶ 27.)

Copp was diagnosed with a sprained ankle and was told she could return to her "activities

---

[6] "Payroll hours" refers to "the total number of employee-hours across all shifts that a store manager is permitted to schedule employees to work in a given week."  (#67 ¶ 43.)

[7] By fall of that year, Copp had received an eighty-hour payroll budget for the Hingham store, *see* #64 ¶ 56, though she says that, post-COVID, the store was "never fully staffed[.]"  (#62-12 at 23.)

[8] As described in an incident report prepared by Zach Walsh, a Nic & Zoe Human Resources manager, *see* #62-2 at 6, "[a]s she descended with the item in hand, Ms. Copp missed two steps of the ladder and fell backwards."  (#62-28 at 4.)

of daily living as tolerated." (#62-27 at 4.) Copp returned to work several days later to what she says were her "[r]egular duties." (#64 ¶¶ 97; #62-12 at 38.) According to Song, on Copp's return, she told Copp to "'[l]et [her]self heal" and to sit when working if needed. (#62-9 at 23.)

After she received further treatment in April 2022, Copp was diagnosed with an ankle fracture and told to avoid "high impact activities[.]" (#62-31 at 5.) Copp requested medical leave pursuant to the Family Medical Leave Act ("FMLA"), which Nic & Zoe allowed; she began that leave in late May, and it lasted approximately four weeks. (#64 ¶¶ 103-05.)

Song, who had been instructed not to communicate with Copp while she was on leave, stepped in to cover for Copp, *see* #62-9 at 28-31, gave store employees her (Song's) cell phone number and posted it in the stockroom, and told employees not to "disturb" Copp during this time. *Id.* at 33. Still, Copp says that while out on leave she received a call and a text message from her colleagues when they needed her help. (#67 ¶ 17.) First, Song called Copp once to get her approval before rearranging the stockroom and Copp's belongings to give Copp more room for her desk; second, a part-time sales consultant texted Copp asking for her computer login credentials.[9] (#64 ¶¶ 110-14.) In both cases, Copp responded to her colleagues. *See id.*

Copp also says that she continued to process and approve store payroll while on leave, though she acknowledges that no one at Nic & Zoe asked her to. (#62-12 at 48.) On at least one occasion, Song, who took over responsibility for entering payroll during this time, went to approve it for a particular week but discovered it already had been approved. (#58-12 at 9-10.) It was only after Copp resigned that Nic & Zoe discovered that it was Copp who had approved the week. (#64 ¶ 121.)

---

[9] Song testified that she had no idea whether any employees contacted Copp during her leave. *See* #62-9 at 32-33.

In late June 2022, Copp returned from FMLA leave.  *Id.* ¶ 123.

E.  Copp Returns from Leave, Only to Resign Four Months Later.

   1. The Dispute over Safe Storage of Store Inventory.

According to Copp, Song periodically criticized how Copp ran the store and made "disparaging comments" to other employees, particularly with respect to Copp's use of a dressing room to temporarily store inventory boxes she couldn't move to the stockroom—a recurring issue which Copp says was "the bane of [her] existence."  (#62-12 at 55-56, 68.)  As Copp explained:

> [t]he bone of contention was utilizing one of the dressing rooms to put boxes or, you know, storage of things that I felt weren't safe to keep in the back stockroom and whatnot. And [Song] would talk to my employees about things that she didn't like what I did.
> . . .
>
> And when you're by yourself and you receive 30 cases in, 50 pounds each, and you're the only one in a store that has to go back and forth from the front room to the stockroom and climb ladders, you have to provide for safety, clear pathways, one person cannot run a store, front-face every single client, receive merchandise in at the same time. And those boxes have to go somewhere.
> . . .
>
> So if I stacked them up, I had it, like, blocked a whole area of my stockroom where I couldn't receive merchandise.

(#62-12 at 56, 61, 65-66.)

On one occasion around September 2022, *see id.* at 58, 70, Kerrie McLellan, Nic & Zoe's Vice President of Retail, sent a picture in a text message group chat with her, Song, and Copp of an inventory box in one of the Hingham store's dressing rooms.  Her accompanying text read: "Hi Tracy . . . Will you please ensure that we are not using any fitting room for storage or processing. You really do have enough room in your stockroom." (#62-38 at 2-3.)  Copp responded:

> [t]his will be removed…this is always a result of new shipments and DRP coming in at once and processing web and RTV…I know you can't see it now but when running to and from the sales floor with all the boxes in the back can be dangerous and the ladders on top of it make it too difficult not to spill over…I would like to

6

discuss further to explain my issues and concerns[.]

*Id.* at 2, 4-6 (ellipses in original).  According to Copp, "within a minute" of having sent the text message, Song called and "yell[ed]" at her for her response to McLellan.  (#62-12 at 57-58.)

Copp said at her deposition:

[s]o this is just them continuously telling me not to use that stockroom, and me continuously telling them that it's impossible for one person to be in a store, not knowing when these boxes were coming in. So you couldn't schedule somebody else, whether you could even get anybody else in. But normally, pre-COVID when you knew that you were getting shipments in, you would schedule to that, and usually a crew of people did that. I never really even had to do that. So now on top of it all, I had to deal with those cases. If I was by myself, sometimes it sat there for a day where I couldn't even get to it because I was servicing clients in the store.

*Id.* at 65-66.

It was after this text exchange with Song and McLellan that Copp says she decided to call Walsh and discuss her "safety concerns, the ladders," and her experiences with Song.  *Id.* at 58.

2. The Dispute over Tissue Paper.

On September 20, 2022, Copp met with Song, along with other store managers, as part of a recurring "all-store call."  (#62-12 at 79, 81-82.)  The day before, Copp had emailed a colleague requesting that Phyllis Castillo, Nic & Zoe's Director of Visual Merchandising, be asked whether the Hingham store could order white tissue paper as opposed to the black variety it used to package customer purchases.  (#64 ¶¶ 138-40.)  According to Song, black tissue paper "was the brand directive," and "it wasn't anyone's decision to change the color of the tissue other than bring it to the brand."  (#62-9 at 24.)  During the September 20 call, Song asked Copp to share why she had requested that the white variety be ordered, to which Copp stated that a client had complained of black tissue paper staining her purchase.  (#64 ¶ 141-42); *see* #62-12 at 80.  Copp says that Song then became "very angry[,]" *see* #62-12 at 81; Copp shared her frustration over Song's "tone" and her "hostility" when she and Walsh later spoke.  *Id.* at 82; #64 ¶¶ 145-47.

7

Song felt as though Copp's responses when asked about the tissue paper were "out of character," and McDonald later learned of the incident.[10]  *Id.* ¶ 150; *see* #62-2 at 7-8.  According to him, Song was told to inform Copp that if she continued her behavior, she would be terminated. (#64 ¶ 153); *see* #62-2 at 12.  Song told Copp as much when the pair later met and discussed the September 20 call during a scheduled check-in call; during their conversation, Copp asked to meet with Human Resources.  (#64 ¶¶ 152, 154-55.)  Copp then met with McDonald and McLellan on September 29, 2022, who repeated the warning.[11]  *Id.* ¶ 156.

After the September 29, 2022 meeting, Copp arranged to meet with Song in person "to repair their relationship[,]" *see id.* ¶ 157, and determine "how [they] c[ould] best move forward." (#62-36 at 3.)  Song, who wanted "to just clear the air[,]" *see* #62-9 at 26, agreed, and the pair met on October 6, 2022 to discuss the events of the September 20 call.  (#64 ¶¶ 158-59.)  After the meeting, Song felt as if she and Copp "were good[,]" and she told Copp as much.  (#62-9 at 27.)

Just over two weeks later, however, on October 21, 2022, Copp resigned from Nic & Zoe, citing "'an unsafe, demoralizing, and bullying environment'" where she says "the undue stress caused by her working conditions (which included lack of adequate staffing) created such an intolerable situation that she had no choice" but to do so.  (#67 ¶ 30); *see* #58-13 at 1.

Additional facts have been added below, where appropriate.

---

[10] As Song testified: "for [Copp] to respond in such a disrespectful way to me . . . in front of all of my other direct reports, it made a lot of people uncomfortable[.]"  (#62-9 at 26.)

[11] McDonald testified that Copp was "[a]brupt, harsh," and "abrasive" with her supervisors "[f]airly frequently."  (#62-2 at 8.)  When he met with Copp on September 29th, McDonald told her that her behavior toward Song was "unacceptable" and "unprofessional"; that he expected that she and Song "would move forward very positively"; but "that if further behavior of the same nature continued . . . there would be disciplinary action up to and including termination of employment."  *Id.* at 7-8.

III.  Legal Standard.

Summary judgment is intended "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (additional citation and quotations omitted). A motion for summary judgment should be allowed where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of asserting "the absence of a genuine issue of material fact" and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (additional citation omitted).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." *Id.* (quotations, citations, and alteration omitted).  "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (additional citation and quotations omitted).

In assessing whether summary judgment is proper, the court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "Where, as here, the parties cross-move for summary judgment, the court must assay each motion 'separately, drawing

9

inferences against each movant in turn.'"  *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *EEOC v. Steamship Clerks Union*, 48 F.3d 594, 603 n.8 (1st Cir. 1995)). In this way, "[c]ross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (additional citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (additional citation and quotations omitted).

IV. Discussion.

    A.  The Summary Judgment Motions.

        Copp moves for partial summary judgment as to liability on Counts I and II of her complaint, which allege "Failure to Pay Overtime, in Violation of M.G.L. c. 151, § 1B" (Count I), and "Failure to Pay for All Hours Worked, in Violation of M.G.L. c. 149, § 148" (Count II).  (#1-1 ¶¶ 56-68.) Nic & Zoe, which opposes Copp's motion, *see* #66, moves for summary judgment on Counts I and II, and on all other counts in Copp's complaint: Counts III-VIII, and X.

    B.  Copp's Claims.

        1. "Failure to Pay Overtime" (Count I); "Failure to Pay for All Hours Worked" (Count II).[12]

        In Count I, Copp alleges that Nic & Zoe violated the overtime pay provisions of the Massachusetts Fair Minimum Wage Law ("FMWL"), Mass. Gen. Laws ch. 151, § 1A, as she was

---

[12] Copp alleges in Count II that Nic & Zoe violated the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 et seq. (the "Wage Act"), by failing to pay "the full amount of wages owed to her[.]" (#1-1 ¶ 67.)  To succeed on a Wage Act claim, "a plaintiff must show that (1) he was an employee under the statute," that "(2) his form of compensation constitutes a wage under the statute," and that "(3) the defendants violated the Act by not paying him his wages in a timely manner."  *Napert v. Gov't Emples. Ins. Co.,* 36 F. Supp. 3d 237, 242 (D. Mass. 2014).

not compensated "for any hours of work she performed in excess of [the] initial forty hours of work each week." *Id.* ¶ 61. Copp estimates that she worked approximately 3,598 hours of overtime, and consequently is owed more than $184,637. *Id.* ¶ 62; *see* #67 ¶¶ 19-20.

To succeed on a claim for unpaid overtime under the FMWL, a plaintiff must prove "'both that he incurred unpaid overtime work, and that the employer had actual or constructive knowledge that he was working overtime.'"[13] *Austin v. Ken's Foods, Inc.*, 772 F. Supp. 3d 163, 174 (D. Mass. 2025) (quoting *Gendron v. Kinjawi*, Civil Action No. 22-11910-JEK, 2025 WL 604954, at *8 (D. Mass. Feb. 25, 2025)) (citing *Vitali v. Reit Mgmt. & Rsch., LLC*, 36 N.E.3d 64, 69 (Mass. App. Ct. 2015)).

The question is whether Nic & Zoe appropriately classified Copp as exempt from the overtime pay requirements of the FMWL. Copp argues that given the nature and circumstances of her employment as a store manager she was entitled to overtime pay, and that Nic & Zoe's misclassification, and its failure to compensate her for the overtime hours she worked, were unlawful. *See* #55 at 1. Nic & Zoe counters that Copp was not eligible for overtime compensation as a store manager where the work she performed rendered her statutorily exempt. *See* #66 at 1-3.

a. The FMWL and the "Administrative Exemption."

Under § 1A of the FMWL,

> . . . no employer in the commonwealth shall employ any of his employees in an occupation, as defined in section two, for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.

Mass. Gen. Laws ch. 151, § 1A.

---

[13] Neither party addresses whether Nic & Zoe had actual or constructive knowledge that Copp was working overtime.

Section 1A, however, is inapplicable to any employee that fits in one of its twenty enumerated exemptions, *see* § 1A(1)-(20).  One exemption, § 1A(3), is at issue here.  Under § 1A(3), the overtime pay provisions of § 1A are inapplicable to any employee who is employed "(3) as a bona fide executive, or administrative or professional person or qualified trainee for such position earning more than eighty dollars per week."  Mass. Gen. Laws ch. 151, § 1A(3).

Massachusetts regulations provide that the terms "'*bona fide* executive, or administrative or professional person[,]'" as they are used in § 1A(3), "shall have the same meaning as set forth in 29 C.F.R. Part 541."  454 C.M.R. § 27.03(3) (emphasis in original); *see Swift v. AutoZone, Inc.*, 806 N.E.2d 95, 98 (Mass. 2004) (recognizing that "the overtime provisions under State law were intended to be essentially identical to Federal law") (additional citations and quotations omitted); *see also Litz v. St. Consulting Group, Inc.*, 772 F.3d 1, 6 (1st Cir. 2014) ("In construing [§ 1A(3)], Massachusetts looks to track federal law.") (collecting cases).

Part 541, § 541.200, "General rule for administrative employees[,]" provides, in relevant part, that

> (a) [t]he term 'employee employed in a bona fide administrative capacity' . . . shall mean any employee:
>
> > (1) [c]ompensated on a salary or fee basis at not less than the level set forth in § 541.600;
> >
> > (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> >
> > (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

12

29 C.F.R. § 541.200.[14]

For the exemption to apply, "each of [§ 541.200(a)'s] three prongs must be satisfied and the employer bears the burden of establishing each prong." *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 5 (1st Cir. 2023) (citing *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7-8 (1st Cir. 1997)).

             i. Prong (2) of the Administrative Exemption, 29 C.F.R. § 541.200(a)(2).

Of § 541.200(a)'s three prongs, only (2) is in dispute. *See* #66 at 3 n.1. This prong is addressed in 29 C.F.R. § 541.201:

> (a) [t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.
> . . .

29 C.F.R. § 541.201(a).

Sections 541.700, "Primary duty[,]" and 541.703, "Directly and closely related[,]" provide more context. Section 541.700, for example, states that to qualify for an exemption, "an employee's 'primary duty' must be the performance of exempt work" where "'primary duty'" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

Such a determination must be

> based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other

---

[14] 29 C.F.R. § 541.100, "General rule for executive employees[,]" considers the exemption as it relates to an "(a) . . . 'employee employed in a bona fide executive capacity[.]'" Nic & Zoe does not argue that any "executive" exemption applies here.

employees for the kind of nonexempt work performed by the employee.

*Id.* While the amount of time an employee spends performing exempt work is not dispositive, it "can be a useful guide[,]" and "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Still, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*

Relatedly, § 541.703 provides that work "'directly and closely related'" to the performance of exempt work "is also considered exempt" where "'directly and closely related'" means

. . .

> tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, 'directly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. . . . Work is not 'directly and closely related' if the work is remotely related or completely unrelated to exempt duties.

29 C.F.R. § 541.703(a).[15]

b. Applicability of the Administrative Exemption in Copp's Case.

In examining § 541.200(a)(2)'s application, the First Circuit has instructed that a "relational" analysis is necessary. *Walsh,* 64 F.4th at 6. In conducting this inquiry, the court is to "clearly identify the primary duty of the employee[] in question" and then determine "whether that duty is directly related to 'running or servicing of the business.'" *Id.* (quoting 29 C.F.R. § 541.201(a)). Therefore, "it is often useful to identify and articulate the business purpose of the

---

[15] *See* 29 C.F.R. § 541.703(b)(5) ("A department manager in a retail or service establishment who walks about the sales floor observing the work of sales personnel under the employee's supervision to determine the effectiveness of their sales techniques, checks on the quality of customer service being given, or observes customer preferences is performing work which is directly and closely related to managerial and supervisory functions.").

employer and (if necessary) the employer's customers" so that a court

> may then compare the employee's primary duty to the business purpose of the employer and/or the employer's customers to determine whether the employee's primary duty directly relates to the business purpose or, conversely, is directly related to the running or servicing of the business.

*Id.* at 6-7 (additional quotations and citations omitted). Thus, if the employee's "primary duties relate to [her employer's] business purpose, in that [she] produce[s] the product or provide[s] the service that the company is in business to provide, the second prong is not satisfied" and the exemption is inapplicable. *Id.* at 7 (citing 29 C.F.R. § 541.200(a)(2)).

"'How an employee spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA requirements is a question of law.'" *Modeski v. Summit Retail Solutions, Inc.*, 470 F. Supp. 3d 93, 100-01 (D. Mass. 2020) (quoting *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 27 (D. Mass. 2015)). Consequently, determining an employee's exempt status "'remains intensely fact bound and case specific.'" *Bolduc v. National Semiconductor Corp.*, 35 F. Supp. 2d 106, 114 (D. Me. 1998) (quoting *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996)).

Although the parties agree that Nic & Zoe's primary business purpose "is to sell clothing to consumers[,]" *see* #67 ¶ 45, they dispute Copp's primary duty as a store manager and its relationship to the company's business purpose. Copp argues that her primary duty was to sell Nic & Zoe's clothing, a task she says was "*central*" to the company's business purpose. *See* #56 at 10-12 (emphasis in original). Nic & Zoe acknowledges that while Copp completed individual sales transactions even as a store manager, her primary duty was not to sell its clothing but instead to manage its Hingham store and oversee its operations, a task which involved running the business, not selling its products. *See* #66 at 1-3.

Pointing to her formal job description and the deposition testimony of its management, Nic

15

& Zoe argues that it properly classified Copp as an exempt administrative employee. *Id.*; *see* #60 at 7.  A job title, however, "is not determinative of whether an employee is exempt under the FLSA." *Holden v. Cenpatico Behavioral Health, LLC,* 347 F. Supp. 3d 77, 86 (D. Mass. 2017) (additional citation omitted).  Nor is an "'employer's characterization of those activities through a job title or job description.'"  *Id.* (quoting *Pippins v. KPMG, LLP*, 921 F. Supp. 2d 26, 42 (S.D.N.Y. 2012)). Rather, the exemption analysis turns on the employee's "'actual work activities[.]'"  *Id.*; *see* 29 C.F.R. § 541.700(a) (defining an employee's "'primary duty'" for exemption purposes as "the principal, main, major or most important duty that the employee performs").

Applying the "relational" analysis described in *Walsh*, the court finds as follows.

i. July 14, 2018 – June 2020.

Nic & Zoe sustains its burden to show the applicability of the administrative exemption to Copp's employment as a store manager for the period beginning on July 14, 2018, the date she started in that role, *see* #64 ¶ 8, to June 2020, when the Hingham store reopened from the pandemic.

There are no genuine disputes of fact about what Copp's primary duties were during this period, and how she spent her time at work.  Copp herself testified that her "most important dut[ies]" as a store manager were "obviously . . . the daily operations of the store, communications to keep that store running in fit condition, my employees staffing the store," and "sales and merchandising[.]"  *See* #58-7 at 23.  In furtherance of these duties, Copp partnered with Nic & Zoe management to help recruit, hire, and fire sales consultants and supervised those that worked in "[her] store"; *see id.* at 10; she participated in their training and coaching, *see* #64 ¶ 42; and she set their work schedules and approved their payroll.  *Id.* ¶¶ 45-46.  When Copp was asked how her role as store manager related to that of the sales consultants she considered "in [her] employ," *see* #58-7 at 10, 14, 23, she remarked that her job was "completely different."  (#62-12 at 94); *see id.*

16

("[B]eing responsible for the operations of the store is completely different than [being] a salesperson.").

In addition to these duties, Copp analyzed and reacted to store trends.  She "discussed on a weekly basis what was selling" and "what wasn't selling" in "her" store.  *Id.* at 20; *see id.* ("I definitely gave my input on what I thought would sell in my store, what my customer was, what the demographic was, what the area was. . . . My store sold more jeans than anybody in the company."). According to Copp, as a store manager, she understood herself to "own [her] own business" and be "responsible for everything within [the Hingham store's] four walls."  *Id.* at 8.  Even though Copp testified that she spent a significant amount of time selling clothing, that fact alone is not dispositive,[16] and "the other factors" of her employment during this period compel the conclusion that Nic & Zoe appropriately classified her as exempt.  29 C.F.R. § 541.700(b).[17]

In short, there can be no genuine dispute as to what Copp's primary duty was during this period; it was not directly related to the sale of Nic & Zoe clothing but was instead "directly related to the running or servicing" of the company's business.  *Walsh,* 64 F.4th at 7.

ii. June 2020 - October 21, 2022.

The applicability of the administrative exemption during the period beginning from the Hingham store's reopening in June 2020 to Copp's resignation on October 21, 2022 is a closer

---

[16] Moreover, while Copp testified that she spent the most amount of time during her workday on "sales," *see* #58-7 at 24, she did not specify whether she was referring to her responsibilities before the pandemic and/or afterward, a period in which she states—in her brief in support of her motion for summary judgment—that she "spent the majority of her time working on sales."  (#56 at 14.)

[17] *See* 29 C.F.R. § 541.700(c) ("Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register.")

question, and the court cannot discern, on the present record, whether Copp remained "'plainly and unmistakably'" subject to that exemption. *Hines v. State Room, Inc.*, 665 F.3d 235, 242 (1st Cir. 2011) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)) (additional citation omitted).

Copp argues that the onset of the COVID-19 pandemic drastically changed her job responsibilities and that she "thereafter spent the majority of her time working on sales." (#56 at 14.) As Copp testified, reduced staffing levels during this period meant that she often worked alone and had to fulfill all the needs of the business with limited—and often, no—help. As she testified, "the main focus when we got back from COVID was sales. That's all they wanted you to do. 'Don't worry about anything else but sales . . . sales, sales.'" (#58-7 at 9-10); *see* #62-12 at 19 ("[P]ost-COVID it was different. I was given different directions, and I could say that the core responsibilities had changed. The focus was just sell. 'Don't do any administrative work. Don't do,' you know, 'the merchandising.'"). As a result, Copp says that she worked "far more than 40 hours per week practically every week" to keep up. (#57 ¶ 15.)

It is undisputed that Copp remained responsible during this period for the management duties for which she was hired, and that she continued performing those duties. To what extent, however, is not clear. Conducting a relational analysis requires that the court first "clearly identify the primary duty of the employee[] in question," something that cannot be done on this record given the factual disputes that remain. *Walsh,* 64 F.4th at 6; *see Cash v. Cycle Craft Co.*, 508 F.3d 680, 684 (1st Cir. 2007) (quoting 29 C.F.R. § 541.700(a) for the proposition that "'[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.'").

This question is best left to a factfinder.[18]  *See* Walsh, 64 F.4th at 6-7, 9 (reversing summary judgment decision where genuine issues of material fact remained "unresolved" and the court concluded that it would "leave it to the trier of fact to apply the 'relational' analysis required by [29 C.F.R. § 541.200(a)(2)]") (additional citation and quotations omitted).

Accordingly, Copp's motion for summary judgment is denied as to Counts I and II; and Nic & Zoe's motion for summary judgment is allowed in part and denied in part as to Counts I and II.[19]

2. "FMLA Interference in Violation of 29 U.S.C. § 2615" (Count III).

In Count III, Copp alleges that Nic & Zoe interfered with her FMLA leave in violation of 29 U.S.C. § 2615 "by requiring her to perform some of her regular duties while on leave." (#1-1 ¶¶ 70, 73.)  Nic & Zoe argues that Copp's claim fails where Copp was allowed to take leave, the company did not prevent or otherwise discourage her from doing so, and never required her to work during her leave.  *See* #60 at 10-11.

29 U.S.C. § 2615(a)(1) makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  "To succeed on a claim of interference with FMLA rights, 'a plaintiff must first show that her employer denied her FMLA benefits to which she was entitled.'"  *Gregg v. Ne. Univ.*, 743 F. Supp. 3d 257, 276 (D.

---

[18] Moreover, genuine disputes of fact remain as to whether, and to what extent, Copp worked more than forty hours during this period, *see* #66 at 8-9; and, as discussed above, *see supra* n.13, neither party has addressed whether Nic & Zoe had actual or constructive knowledge that Copp was working overtime.  *See Austin,* 772 F. Supp. 3d at 174.

[19] Count II thus survives to the extent Copp alleges she is owed unpaid overtime wages, under the Wage Act, for the period of June 2020 to the date of her resignation.  *See O'Brien v. Lifestyle Transp., Inc.*, 956 F. Supp. 2d 300, 309 (D. Mass. 2013) (where employee could be found to be entitled to overtime under ch. 151 § 1A, he could "also proceed under Mass. Gen. Laws. ch. 149 § 148 and hold the defendants accountable for not paying that overtime in a timely manner"); *see also Nunez v. Syncsort Incorporated*, 268 N.E.3d 324, 330 n.1 (Mass. 2025) (Budd, C.J., concurring).  Moreover, neither party addresses Copp's allegation that she "was never paid the Sunday premium rate required by Massachusetts law."  (#1-1 ¶ 11.)

Mass. 2024) (quoting *Lopera v. Compass Grp. USA, Inc.*, 578 F. Supp. 3d 130, 135 (D. Mass. 2021)); *see Carrero-Ojeda v. Autoridad De Energia Electrica,* 755 F.3d 711, 722 (1st Cir. 2014) ("The key issue is simply whether the employer provided its employee the benefits to which she was entitled per the FMLA.") (additional citation omitted).

There is no dispute that Copp received the FMLA leave she requested, and that she was not denied any FMLA benefits to which she was entitled. Nor is there any evidence that Copp was "discouraged" from taking FMLA leave. *See Gregg*, 743 F. Supp. 3d at 276-77 (allowing summary judgment for employer where there existed no evidence that employer "discouraged . . . chill[ed] or interfere[d]" with plaintiff's use of the benefit) (additional quotations omitted) (alterations in original); *see also Stratton v. Bentley Univ.*, 113 F.4th 25, 47 (1st Cir. 2024) (interference claim was properly dismissed where plaintiff "pointed to no direct evidence" that she had been discouraged from taking leave or that her supervisors had a problem with her doing so) (collecting cases).

Insofar as Copp argues, in opposing summary judgment on this count, that Nic & Zoe interfered with her use of the benefit by requiring her to work while on leave, *see* #63 at 6-7, it is undisputed that Nic & Zoe never asked Copp to process or approve payroll during her FMLA leave or engage in any other job duties. *See Persson v. Boston Univ.,* Civil Action No. 15-14037-JGD, 2019 WL 917205, at *18 (D. Mass. Feb. 25, 2019) (allowing summary judgment to employer on FMLA interference claim where employee, who had been called twice during her leave, had not claimed "that she was 'on call' or otherwise required to work while on leave") (collecting cases).

To the extent Copp argues that the single phone call and text message she received during her FMLA leave interfered with her use of the benefit, that argument fails. Song called Copp once to receive Copp's permission before reorganizing the stockroom to make more room for Copp's

20

desk, *see* #62-9 at 32-33; another employee texted Copp once to ask for Copp's computer login credentials.  (#62-12 at 45-47.)  In both cases, Copp responded voluntarily and briefly, and performed no actual work.  *See Massey-Diez v. Univ. of Iowa Cmty. Med. Servs.,* 826 F.3d 1149, 1158-59 (8th Cir. 2016) ("For purposes of summary judgment, courts have drawn the line along a distinction between, on the one hand, receiving nondisruptive communications such as short phone calls requesting the employee to pass on institutional knowledge or property as a professional courtesy, and, on the other, requiring the employee to complete work-related tasks or produce work product.") (and cases cited).

Accordingly, Nic & Zoe is entitled to summary judgment on Count III.

3. "FMLA Retaliation in Violation of 29 U.S.C. § 2615" (Count IV).

Copp next claims that Nic & Zoe carried out "materially adverse employment actions against [her]" in retaliation for her having taken FMLA leave.  (#1-1 ¶¶ 79-81.)

For an employee to make out a prima facie case of FMLA retaliation, she must show that "'(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision, and (3) there was a causal connection between [her] protected conduct and the adverse employment action.'"  *Stratton,* 113 F.4th at 48 (quoting *Carrero-Ojeda*, 755 F.3d at 719) (additional citations and quotations omitted) (alteration in original).  *See Gregg,* 743 F. Supp. 3d at 277 (noting that "'[t]o state a retaliation claim under the FMLA where direct evidence of retaliation is lacking, a plaintiff must first make a prima facie showing[.]'") (quoting *Lopera*, 578 F. Supp. 3d at 136) (emphasis omitted).  Once this showing has been made, "the burden shifts to the defendant who must then articulate a legitimate, non-retaliatory reason for the adverse action." *Id.* (additional citation and quotations omitted).

In the context of FMLA retaliation, adverse employment actions "are those which 'a

21

reasonable employee would [find to be] materially adverse in the sense that [they] would dissuade the employee from taking FMLA leave.'"  *Id.* at 278 (quoting *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 915 F. Supp. 2d 187, 199 (D. Mass. 2013), *aff'd* 748 F.3d 418 (1st Cir. 2014)) (additional citation and quotations omitted) (alterations in original).  Although it "'need not alter the terms and conditions of employment,'" such an effect "'must be more disruptive than a mere inconvenience or alteration of job responsibilities.'"  *Harvey v. Mass. Inst. of Tech.*¸ Civil Action No. 24-11741-DJC, 2024 WL 5008884, at *4 (D. Mass. Dec. 6, 2024) (quoting *Haglund v. Estee Lauder Companies, Inc.*, 466 F. Supp. 3d 292, 297 (D. Mass. 2020)) (additional citation and quotations omitted).

With regard to the requisite causal connection, while "a 'very close temporal proximity' may be sufficient to 'meet the relatively light burden of establishing a prima facie case of retaliation,'" *see Stratton,* 113 F.4th at 49 (first quoting  *Germanowski v. Harris*, 854 F.3d 68, 74 (1st Cir. 2017), then *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008)) (internal citation omitted), "temporal proximity alone is insufficient where the 'larger picture undercuts any claim of causation.'"  *Harvey*¸ 2024 WL 5008884, at *4 (quoting *Carrero-Ojeda,* 755 F.3d at 720) (additional citation omitted).

Copp does not make out a prima facie case.  She first argues that Nic & Zoe management "criticized her store's performance while she was on leave" during an August 23, 2022 meeting she attended with Song, McLellan, and Avra Myers, Nic & Zoe's Chief Executive Officer.  (#63 at 7); *see* #64 ¶ 127; #62-19 at 5.  Copp testified that questions she received from Myers during the meeting about the Hingham store's sales for the month of June 2022 "g[a]v[e] [] the impression that [she] wasn't doing [her] job and [that] [her] store wasn't performing to where [Myers] thought it should be."  (#62-12 at 10-11.)  Still, Copp does not claim that she was harassed or that her job

22

responsibilities were impacted because of the conversation.  Even assuming, *arguendo*, that Myers' comments amounted to an adverse employment action, Nic & Zoe set its sales goals for the month of June 2022 in February 2022, *see* #62-1 ¶¶ 9-10, roughly three months before Copp requested FMLA leave, which undercuts any argument that questions posed to Copp about the store's June 2022 performance were raised in retaliation for her having taken leave.[20]  *See Carrero-Ojeda,* 755 F.3d at 720 (acknowledging that "the surrounding circumstances" may "undermine any claim of causation").

Finally, Copp argues that she experienced retaliation where she was "singled out and criticized harshly for practices that were practically universal among store managers, such as storing boxes in spare dressing rooms until they had sufficient staffing and time to unpack them."  (#63 at 8.)  Again, assuming *arguendo* that management's comments that Copp should properly store inventory amounted to an adverse employment action, Copp admits that this alleged criticism predated her leave.  *See* #64 ¶ 78 (Copp acknowledging as undisputed her testimony that Song made "disparaging comments about her storage of boxes in the dressing rooms before she took FMLA leave").  There is no evidence that Song, or any other Nic & Zoe manager, began to make these comments after Copp requested FMLA leave as opposed to before, and the "'larger picture'"— namely, Copp's statement that this issue was "the bone of contention from the day [Nic & Zoe] opened post-COVID" and thus one which started well before she was injured and requested leave years later, *see* #62-12 at 64—"'undercuts any claim of causation.'"  *Harvey¸* 2024 WL 5008884, at *4 (quoting *Carrero-Ojeda,* 755 F.3d at 720); *see Stratton,* 113 F.4th at 49-50 (retaliation claim

---

[20] Copp also claims that Nic & Zoe managers "mocked her injury" when she returned from leave, *see* #63 at 7-8, but identifies no evidentiary support in the record for her claim.  *See Stratton*, 113 F.4th at 49 n.20 (evidence supporting the plaintiff's claims that managers "became increasingly hostile toward her" once she took leave was "far too conclusory and vague to create a genuine dispute of fact") (citing *Villeneuve v. Avon Prods. Inc.*, 919 F.3d 40, 54 (1st Cir. 2019)).

was properly dismissed where concerns over the plaintiff's performance had been raised "well before she requested FMLA leave").

Nic & Zoe's motion for summary judgment is allowed as to Count IV.

4. "Constructive Termination" (Count V).

In Count V, Copp alleges that at the time of her resignation, Nic & Zoe "had created working conditions so difficult and unpleasant for her that a reasonable person in [her] position would have felt compelled to resign."  (#1-1 ¶ 84.)

Constructive discharge, or "constructive termination" as Copp alleges here, "is merely a doctrine used to prove an element of a wrongful discharge claim — that is, that the employee was in fact discharged, rather than left voluntarily"; there is "no such independent cause of action under Massachusetts law."  *Kelleher v. Lowell General Hospital*, 152 N.E.3d 126, 131 (Mass. App. Ct. 2020) (collecting cases); *see Baker v. Massachusetts State Police Department*, Case No. 24-P-112, 2025 WL 1276058, at *3 (Mass. App. Ct. May 2, 2025) (issued pursuant to Mass. App. Ct. R. 23.0) ("In other words, the employee must have some right not to be discharged that arises from the common law, a contract, public policy, or a statute.") (citing *Kelleher*, 152 N.E.3d at 131).

Although Copp does not allege wrongful discharge or wrongful termination explicitly, Nic & Zoe does not argue that Count V should be dismissed for this reason, and the parties appear to have consistently treated the claim as one alleging wrongful discharge or termination based on a theory of constructive discharge.  The court will do the same.

A constructive termination or discharge can be said to occur "'when [an] employer's conduct effectively forces an employee to resign."  *GTE Prods. Corp. v. Stewart*, 653 N.E.2d 161, 168 (Mass. 1995) (quoting *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244-45 (1994)).  In this way, the law regards a constructive discharge "as a firing rather than a resignation."  *Id.*  "[T]o

prove constructive discharge, a plaintiff must usually show that [her] working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 521 (1st Cir. 2009) (quoting *Torrech-Hernandez v. GE*, 519 F.3d 41, 50 (1st Cir. 2008)) (additional citations and quotations omitted); *see GTE Prods. Corp.*, 653 N.E.2d at 168-69 ("'[T]he trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign'"; the alleged conditions must be assessed objectively) (quoting *Alicea Rosado* v. *Garcia Santiago,* 562 F.2d 114, 119 (1st Cir. 1977)) (additional citations omitted).

Nic & Zoe argues that Copp has failed to present evidence that the unsafe working conditions she alleges to have experienced were so onerous and intolerable that a reasonable person in her shoes would have felt compelled to resign. *See* #60 at 15.  More specifically, it argues that the Hingham store's stockroom was not "inherently unsafe[,]" as Copp asserts, and that Copp's broken ankle was an injury "of her own making[.]" *Id.* at 15-16.

A reasonable jury could find otherwise.  The parties agree that Copp, who was the only employee in the store at the time of the January 14, 2022 incident, was "rushing" when she fell. (#67 ¶ 27; #64 ¶ 91).  As Copp testified, however, she found it impossible, when working by herself, to safely "go back and forth from the front room to the stockroom and climb ladders . . run [the] store, front-face every single client, [and] receive merchandise in at the same time[,]" *see* #62-12 at 56, 61, 65-66. As a result, Copp had begun to use one of the store's dressing rooms to store inventory boxes—which ranged "anywhere from . . . 30 to 50 pounds"—because she felt that they "weren't safe to keep in the back stockroom" and because she lacked the staffing to see that they were properly stored. *Id*.

Even though Copp resorted to storing boxes in the dressing room out of concerns over

workplace safety, including after her fall, she says that Song criticized her use of the space and told other Nic & Zoe employees of her disapproval. *See id.* at 55-56, 68. When, around September 2022, *see id.* at 58, 70, McLellan sent Copp and Song a text message instructing Copp to avoid using the dressing room as storage, Copp replied:

> I know you can't see it now but when running to and from the sales floor with all the boxes in the back can be dangerous and the ladders on top of it make it too difficult not to spill over…I would like to discuss further to explain my issues and concerns[.]

(#62-38 at 5-6 (ellipsis in original). Despite her concerns, Copp says that Song called her almost immediately and "yell[ed]" at her for her response to McLellan, *see* #62-12 at 57-58, prompting Copp to call Walsh to discuss her "safety concerns, the ladders," and her experiences with Song. *Id.* at 58, 70. When she later met with McDonald and McLellan on September 29, 2022 to discuss the tissue paper incident, Copp says that she was threatened with termination over what McDonald would later characterize in his deposition as a "meaningless" dispute, *see* #65-4 at 5, suggesting that management's comments could have at least in part been motivated by Copp's earlier complaints over workplace safety.

Given these circumstances, a factfinder could conclude, after an objective assessment of these conditions, that a reasonable person in Copp's position would have felt compelled to resign as a result of the unsafe working conditions she endured and the criticism she encountered when she sought to cure them.

Nic & Zoe's motion for summary judgment is denied as to Count V.

5. "Termination in Violation of Public Policy" (Count VI).

Copp asserts, in Count VI, that by complaining to Nic & Zoe "about problems with workplace safety at the [Hingham] store . . . , [she] complained to [the company] about a matter of public policy"; that Nic & Zoe carried out "materially adverse employment actions against [her]"

in response to her complaints; and that, as a result of these actions, she was forced to resign.  (#1-1 ¶¶ 89-94.)

It is "'[t]he baseline common law rule in Massachusetts [] that an employer may lawfully terminate a relationship with an at-will employee at any time — for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind.'"[21]  *Elliott-Lewis v. Abbott Labs., Inc.*, 411 F. Supp. 3d 195, 208 (D. Mass. 2019) (quoting *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 89 (1st Cir. 2016)).  "As a narrow exception," however, "the Commonwealth protects at-will employees from terminations that conflict with sufficiently important and clearly defined public policies in Massachusetts."  *Murray*, 821 F.3d at 89 (collecting cases).

The Massachusetts Supreme Judicial Court has cautioned that this exception "should be narrowly construed to avoid converting the general at-will rule into 'a rule that requires just cause to terminate an at-will employee.'"  *Meehan v. Medical Information Technology, Inc.*, 177 N.E.3d 917, 920 (Mass. 2021) (quoting *King v. Driscoll*, 638 N.E.2d 488, 492 (Mass. 1994)) (additional citation omitted).  Consequently, the public policy exception "has been recognized 'for asserting a legally guaranteed right (e.g., filing a worker's compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)[.]'"  *Id.* (quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 533 N.E.2d 1368, 1371 (Mass. 1989)) (additional citation omitted) (emphasis in original).  There is also a "fourth category" which exists "to protect those 'performing important public deeds, even though the law does not absolutely require the performance of such a deed.'"  *Id.* (quoting *Flesner v.*

---

[21] Nic & Zoe claims that Copp was an at-will employee. (#60 at 20.)  Copp alleges in her complaint that "[a]t all relevant times, a contract existed between the parties[,]" *see* #1-1 ¶ 96, though she acknowledged at her deposition that she understood her employment to be at-will.  *See* #62-12 at 5.

*Technical Communications Corp.*, 575 N.E.2d 1107, 1111 (Mass. 1991)).

Ultimately, "[w]hether discharging an at-will employee for engaging in particular conduct violates public policy is a question of law for the court," *see Dexter v. Dealogic, LLC¸* 390 F. Supp. 3d 233, 243 (D. Mass. 2019), and the at-will employee bears the burden "to establish that the substance of h[er] workplace complaints for which [s]he was discharged bears a direct connection to a sufficiently important and clearly defined public policy that warrants h[er] protection from termination." *Murray*, 821 F.3d at 90.

In resisting summary judgment on this claim, Copp, who cites no caselaw on the issue, does not attempt to relate the events of her alleged constructive discharge to any defined public policy. Rather, she makes the vague argument that the "lack of staffing" she received, "along with other working conditions, *created a safety issue.*" (#63 at 10) (emphasis in original). The public policy exception, however, offers no protection to at-will employees "'who claim to be fired for their complaints about internal company policies or the violation of company rules, even though the employees' actions may be considered appropriate and socially desirable." *Mercado v. Manny's T.V. & Appliance, Inc.*, 928 N.E.2d 979, 983 (Mass. App. Ct. 2010) (quoting *Falcon v. Leger*, 816 N.E.2d 1010, 1017-18 (Mass. App. Ct. 2004)) (additional quotations and citations omitted). And even though employees "are generally protected when they report, resist, or refuse to participate in activity that presents a threat to public health or safety[,]" *see Surprise v. Innovation Group, Inc.*, 925 F. Supp. 2d 134, 148 (D. Mass. 2013) (collecting cases), the exception does not "extend so far as to cover all acts by an employee that are directed to illegal, unsafe, or unethical conduct." *Id.* (citing *Wright v. Shriners Hospital*, 589 N.E.2d 1241, 1243-44 (Mass. 1992)). Here, Copp's concerns over workplace safety—namely, the safe storage of boxes of store inventory—amounted to concerns over her own safety and that of her colleagues, not that of store patrons or the broader

28

public.  The issues she raised posed no threat to public safety.  *See Robinson v. Spencer Stuart, Inc.,* Civil Action No. 13-10278-RWZ, 2013 WL 3989672, at *9 (D. Mass. Aug. 5, 2013) (the right plaintiff asserted was one that belonged to him only, and it "'did not substantially implicate any external matter involving . . . public policy'") (additional citation omitted) (ellipsis in original); *King,* 638 N.E.2d at 493 ("[A] remote effect on the public, arising in the context of a conflict over internal policy matters, does not elevate [the conduct alleged] to protected activity.").

Nic & Zoe is entitled to summary judgment on Count VI.

6. "Breach of Contract" (Count VII).

In Count VII, Copp specifically alleges that because of Nic & Zoe's "failure [] to pay overtime wages and [its] failure to provide safe working conditions," the company breached the employment contract that existed between them.  (#1-1 ¶¶ 96-97.)

To prevail on a claim for breach of contract under Massachusetts law, a plaintiff "'must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach.'"  *Minturn v. Monrad*, 64 F.4th 9, 14 (1st Cir. 2023)) (quoting *Young v. Wells Fargo Bank, N.A.*, 828 F.3d 26, 32 (1st Cir. 2016)) (additional citation omitted).

Nic & Zoe argues that Copp cannot establish breach under either theory.  *See* #60 at 18-19. The court agrees.  Copp offers no evidence that Nic & Zoe was under any contractual duty to provide her overtime wages or safe working conditions.  Copp does not cite any documentary source for these alleged contractual rights, but to the extent she claims that the "Offer of Employment" letter she received from Nic & Zoe was a contract which created them, *see* #62-7 at 2, the letter—its status as a valid, binding contract aside—contains no terms or provisions stating that Nic & Zoe specifically contracted with Copp as to either.  An employer's "failure to provide

29

compensation not called for by a contract does not constitute breach." *Drexler v. TEL NEXX, Inc.*, 125 F. Supp. 3d 361, 376 (D. Mass. 2015) (employer could not have breached any contractual obligation where employee sought to enforce a term that was "nowhere to be found in any of the contractual documents" he cited, one of which included his offer letter); *see Escurra v. Shawmut Design & Constr.*, Case No. 06-P-1090, 2007 WL 1149950, at *1 (Mass. App. Ct. Apr. 18, 2007) (issued pursuant to Mass. App. Ct. R. 23.0) (plaintiff did not identify "any contractual obligation undertaken by any defendant that embrace[d] the duty to provide him with safe working conditions").[22]

Nic & Zoe is entitled to summary judgment on Count VII.

7. "Breach of the Implied Covenant of Good Faith and Fair Dealing" (Count VIII).

Copp next alleges, in Count VIII, that Nic & Zoe breached the "covenant of good faith and fair dealing . . . implied in the employment contract between [them]." (#1-1 ¶¶ 101-03.) Nic & Zoe again argues that Copp cannot establish any breach. *See* #60 at 19-20.

"Massachusetts law implies a covenant of good faith and fair dealing in every contract." *Locke v. U.S. Airways, Inc.*, Civil Action No. 11-11350-RWZ, 2013 WL 5441725, at *3 (D. Mass. Sept. 27, 2013) (citing *Fortune v. Nat'l Cash Register Co.*, 364 N.E.2d 1251, 1257 (Mass. 1977)). However, the covenant, which "requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract[,]'" is "only

---

[22] Copp does not argue, or allege in her complaint, that the overtime, timekeeping, or workplace safety policies found within Nic & Zoe's Store Operations Policies and Procedures Guide in any way formed an express or implied contract between her and Nic & Zoe, *see* #62-3 at 2-3; #62-11 at 2-3. *See Grant v. Target Corp.*, 126 F. Supp. 3d 183, 188 (D. Mass. 2015) (recognizing that, in certain circumstances, "'an employee handbook or personnel manual may form the basis of an employment contract that is beyond that of at-will employment'") (quoting *Beebe v. Williams Coll.*, 430 F. Supp. 2d 18, 23 (D. Mass. 2006)) (citing *O'Brien v. New England Tel. & Tel. Co.*, 664 N.E.2d 843, 847-48 (Mass. 1996)).

as broad as rights and duties under the terms of the contract." *R.R. Ave. Props., LLC v. Acadia Ins. Co.*, 37 F.4th 682, 689 (1st Cir. 2022) (quoting *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 924 N.E.2d 696, 704 (Mass. 2010)) (additional citations omitted).  It "'does not create rights or duties beyond those the parties agreed to when they entered into the contract.'" *Id.* (quoting *Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs.*, 974 N.E.2d 1114, 1126 (Mass. 2012)) (additional citation omitted); *see Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 684 (Mass. 2005) ("The scope of the covenant is only as broad as the contract that governs the particular relationship.").

Copp clarifies that her theory of breach is based on Nic & Zoe's alleged failure "to provide a safe working environment," *see* #63 at 12-13, but, as discussed above, Copp presents no evidence that the company ever entered into any contract with her to provide one.

Nic & Zoe's motion for summary judgment is allowed as to Count VIII.

8. "Quantum Meruit" (Count X).

In the final count of the complaint, Copp seeks damages in quantum meruit, alleging that, having "reasonably expected to be compensated by [Nic & Zoe] in accordance with Massachusetts law[,]" the company is liable where it "failed to fully compensate [her] for some of the services and labor she performed."  (#1-1 ¶¶ 114-19); *see id.* ¶¶ 10-11 (alleging failure to pay overtime and failure to pay "Sunday premium rate[,]" respectively).

Under Massachusetts law,

> a plaintiff seeking damages in quantum meruit need only show that (1) he conferred a benefit on the defendant; (2) the defendant accepted that benefit under circumstances where a reasonable person would have expected compensation was due; and (3) the plaintiff did reasonably expect compensation when the benefit was rendered.

*Robinson,* 2013 WL 3989672, at *10 (citing *Bolen v. Paragon Plastics, Inc.*, 747 F. Supp. 103, 106-08 (D. Mass. 1990)) (recognizing that "[a]n at-will employee can surely show all of those elements

31

with regard to services he rendered while employed, regardless of whether he had a reasonable expectation of future employment") (additional citation omitted).

Nic & Zoe gives Count X short shrift, arguing only that Copp's claim for quantum meruit "is barred by the existence of a valid at-will contract." (#60 at 20.) Copp, however, makes clear in her opposition that she pleads quantum meruit "in the alternative," given the "dispute as to whether a valid contract governs the parties' obligations." (#63 at 13.) Though Nic & Zoe is correct in stating that quantum meruit is not "an available avenue of recovery when a valid contract governs the parties' obligations[,]" *see Klauber v. Vmware, Inc.*, 80 F.4th 1, 15 (1st Cir. 2023) (additional citations omitted), neither party has introduced evidence of one.

Nic & Zoe's motion for summary judgment is denied as to Count X.

V. <u>Conclusion.</u>

For these reasons, Copp's motion for summary judgment (#55) is denied; and Nic & Zoe's motion for summary judgment (#59) is allowed in part and denied in part, as follows: the motion is allowed with respect to Counts III-IV, and VI-VIII, denied with respect to Counts V and X, and allowed in part and denied in part with respect to Counts I-II.


April 8, 2026                                    /s/ M. Page Kelley
                                                 M. Page Kelley
                                                 United States Magistrate Judge


32